# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| **WILLIAM LESTER,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) **Case No.: 1:18-CV-0267-VEH** ) |
| **PORTFOLIO RECOVERY ASSOCIATES, LLC,** | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This civil action was originally filed on February 16, 2018, in the Circuit Court of Calhoun County, Alabama by the Plaintiff, William Lester, Jr., against the Defendant, Portfolio Recovery Associates, LLC ("PRA"). (Doc. 1-1 at 7). The Complaint primarily alleges that the Defendant violated various provisions of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x (the "FCRA") (Count One) and the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p (the "FDCPA") (Counts Two through Eight). In addition, the Complaint alleges the Alabama state law claims of: Invasion of Privacy (Count Nine); "Negligent, Wanton, [and/or] Intentional Hiring, Training and Supervision of Incompetent Debt Collectors" (Count Ten); and "Negligence, [Wantonness]/[Intentional]/Malicious Conduct" (Count Eleven). The case was removed to this Court on February 16, 2018. (Doc. 1).

The case comes before the Court on PRA's "Motion To Stay or Dismiss Proceedings and Compel Arbitration" (the "Motion"). (Doc. 16). The Motion has been fully briefed and was the subject of a hearing held on June 20, 2018. For the reasons stated at the hearing and herein, the Motion will be **DENIED**.

I.  STANDARD

The Federal Arbitration Act, 9 U.S.C. §§1-307 (the "FAA") provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C.A. § 4. In the instant case, the dispute is about whether the parties to this action, PRA and Lester, agreed to arbitrate the claims in this case. The Eleventh Circuit has held that

> [w]hether a party has agreed to arbitrate an issue is a matter of contract law and interpretation. *See Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1208 (11th Cir. 2011). "[I]t is the language of the contract that defines the scope of disputes subject to arbitration." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002). "[N]othing in the [Federal Arbitration Act] authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement." *Id*.

*Gamble v. New England Auto Fin., Inc.*, No. 17-15343, 2018 WL 2446607, at *1

(11th Cir. May 31, 2018).

> Further, in addressing the underlying question of whether parties have a valid arbitration agreement, no presumption in favor of arbitration applies. . . . Rather, the well-recognized national policy favoring arbitration comes into play later, when addressing whether a particular claim is covered by an otherwise valid and enforceable arbitration agreement.

*Dasher v. RBC Bank (USA)*, 882 F.3d 1017, 1022–23 (11th Cir. 2018) (citations omitted). Instead, the Eleventh Circuit has stated:

> We agree with our sister circuits that a summary judgment-like standard is appropriate and hold that a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if "there is no genuine dispute as to any material fact" concerning the formation of such an agreement. FED. R. CIV. P. 56(a). A dispute is not " 'genuine' if it is unsupported by the evidence or is created by evidence that is 'merely colorable' or 'not significantly probative.' " *Baloco v. Drummond Co.*, 767 F.3d 1229, 1246 (11th Cir. 2014) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)), cert. denied, ––– U.S. ––––, 136 S. Ct. 410, 193 L.Ed.2d 317 (2015). "This court has consistently held that conclusory allegations without specific supporting facts have no probative value" for a party resisting summary judgment. *See Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (quotation marks omitted).

*Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016).

## I. BACKGROUND

Some time prior to June 2016, William Lester incurred debt on a Lowes Home Improvement ("Lowes") credit card with an account ending in numbers -4658 (the

3

"Account"). The card was issued by Synchrony Bank ("Synchrony"), as successor in interest to GE Capital Retail Bank ("GE").

The credit card and cardholder agreement for the account (the "Agreement") contained two provisions relevant to the instant motion. The first, the Arbitration Provision, provides, in pertinent part:

- **What claims are subject to arbitration**

1. If either you or we make a demand for arbitration, you and we must arbitrate any dispute or claim between you or any other user of your account, and us, our affiliates, agents and/or Lowe's Companies, Inc., if it relates to your account, except as noted below.

2. We will not require you to arbitrate: (1) any individual case in small claims court . . . , so long as it remains an individual case in that court; or (2) a case we file to collect money you owe us. However, if you respond to the collection lawsuit by claiming any wrongdoing, we may require you to arbitrate.

3. Notwithstanding any other language in this section, only a court, not an arbitrator, will decide disputes about the validity, enforceability, coverage or scope of this section or any part thereof . . . . However, any dispute or argument that concerns the validity or enforceability of the Agreement as a whole is for the arbitrator, not a court, to decide.

***

- **Governing Law for Arbitration**

This Arbitration section of your Agreement is governed by the Federal Arbitration Act (FAA). Utah law shall apply to the extent state law is relevant under the FAA.

(Doc. 17-1 at 9). The second provision, the Assignment Provision, provides that Synchrony "may sell, assign, or transfer any or all of our rights or duties under this Agreement or your account, including our rights to payments." (Doc. 17-1 at 9).

PRA claims that, pursuant to the Assignment Provision, it purchased the Account from Synchrony in June of 2016. (Doc. 17 at 8). In support of this claim, PRA has provided the Declaration of Martha A. Koehler, the Manager of Litigation Support for Synchrony, in which Koehler states, *inter alia*:

> According to Synchrony's records, Synchrony sold the Account to [PRA] in June 2016. The Account was one of the accounts sold by Synchrony to Portfolio Recovery Associates, LLC under the Bill of Sale and Affidavit of Sale of Account annexed hereto as **Exhibit G**.

(Doc. 17-1 at 3, ¶14). There is no "Affidavit of Sale of Account" attached to the declaration. However, a Bill of Sale <u>is</u> attached. It reads:

> For value received and in further consideration of the mutual covenants and conditions set forth in the Forward Flow Receivables Purchase Agreement . . . , dated as of this 17th day of July, 2015 by and between Synchrony Bank formerly known as GE Capital Retail Bank ("Seller"), and [PRA] ("Buyer"), Seller hereby transfers, sells, conveys, grants, and delivers to Buyer, its successors and assigns, without recourse except as set forth in the Agreement, to the extent of its ownership, <u>the Receivables</u> as set forth in the Notification Files (as defined in the Agreement), delivered by Seller to Buyer on June 23, 2016, and as further described in the Agreement.

(Doc. 17-1 at 26) (emphasis added). The "Forward Flow Receivables Purchase

Agreement" referenced in the Bill of Sale does not appear in the record.[1] Additionally, the "Notification Files" referenced in the Bill of Sale do not appear in the record.

Lester defaulted on the Account at some point prior to PRA's purchase of it. PRA ultimately sued Lester in state court seeking $4,061.73–the balance due on the Account. In that action, PRA was represented by the national collection firm of Rausch, Sturm, Israel, Enerson & Hornik, LLC. ("Rausch"). Lester negotiated a settlement with Rausch, on behalf of PRA, for dismissal of the state court case in return for Lester's payment to Rausch of $1,016. Upon payment by Lester, the state court case was dismissed with prejudice. The Plaintiff alleges that the payment was a "full and final settlement of the debt Defendant PRA claimed to own." (Doc. 1-1 at 11, ¶33). Indeed, after his payment, Rausch sent the Plaintiff a letter stating, in pertinent part: "THANK YOU FOR YOUR RECENT PAYMENT. YOUR ACCOUNT HAS BEEN RESOLVED." (Doc. 1-1 at 12, ¶42).

The Complaint alleges that PRA continues to falsely report to credit reporting agencies that he owes $3,046 (the original amount of the Account minus the

---

[1] At the hearing on this Motion, the Plaintiff presented to the Court, and opposing counsel, a copy of a Forward Flow Receivables Purchase Agreement dated December 20, 2011, between GE Capital Retail Bank (now Synchrony) and PRA. This agreement is not the agreement referenced in the Bill of Sale, and will not be considered by the Court.

Plaintiff's payment on the settlement). (Doc. 1-1 at 13-16, ¶¶59, 60, 66, 78, 83, 91). The Plaintiff also claims that he disputed the debt with Equifax, TransUnion, and Experian multiple times in the months following the settlement. (Doc. 1-1 at 14, ¶¶70-71). In response, PRA verified the credit reports as accurate. (Doc. 1-1 at 14-15, ¶¶74, 76, 82).

## II. ANALYSIS

There is no dispute that the claims in this case, had they been brought against Synchrony, would be subject to binding arbitration under the Agreement.[2] The Defendant argues that "PRA's purchase of the Account from Synchrony allows it to enforce the agreement, including the Arbitration Provision." (Doc. 17 at 12).[3] It also argues:

> [T]here is also no dispute that PRA is a party to the Terms and Conditions because it lawfully purchased Synchrony's ownership rights in the account per the terms of the Bill of Sale. (See Koehler Decl., at

---

[2] In his brief in opposition to the Motion, the Plaintiff argues that Lester's claims are not covered by the scope of the arbitration provision in the contract. (Doc. 19 at 22-27). However, at the hearing on this matter, counsel for the Plaintiff agreed that if Lester were bringing this claim against Synchrony for the same conduct it alleges against PRA, then the case would have to be referred to arbitration. Furthermore, counsel agreed that if PRA "stands in the shoes" of Synchrony, PRA can compel arbitration. Based on counsel's admission at the hearing, the Court considers this argument in the Plaintiff's brief to be waived, and will not address it.

[3] The first several pages of the Defendant's argument focus on whether there was a valid agreement to arbitrate between Synchrony and the Plaintiff. (Doc. 17 at 9-13). The Defendant also argues that the Plaintiff's claims fall within the scope of the arbitration clause. (Doc. 17 at 14-16). Again, Plaintiff's counsel's admissions at the hearing make these arguments moot. They will not be addressed by the Court.

7

> Ex. G). Synchrony was entitled to sell the Account per the terms of the assignment provision contained in the Terms and Conditions. (*Id*.). Thus, PRA steps into Synchrony's shoes with regards to the Account, and is now a party to the Terms and Conditions. As a result, there is no question a valid and enforceable agreement to agreement exists.

(Doc. 17 at 13-18). In its brief, PRA makes no further argument on this point and provides no authority for same. The Plaintiff is clear in his brief that he <u>is</u> challenging whether PRA obtained to right to arbitrate the claims herein from Synchrony.[4] Thus, the Court must determine whether PRA "stands in the shoes" of Synchrony.

The parties agree that Utah law governs this issue. As noted, the Defendant's argument on this issue is underdeveloped. Thus, in its brief it directs the Court to no provision in Utah law which stands for the proposition that its purchase of "the receivables" in the Bill of Sale executed by Synchrony conveyed Synchrony's right to arbitrate the claims in the instant case. At the hearing however, PRA argued for the application of UTAH CODE ANN. § 70A-9a-404, which provides that, subject to exceptions not relevant here, "the rights of an assignee are subject to . . . all terms of

---

[4] The Plaintiff first argues that "PRA has not presented evidence [that] it owns Lester's [a]ccount." (Doc. 19 at 12; *see also*, doc. 19 at 12-14). Koehler's affidavit is sufficient evidence that, whatever rights were transferred by Synchrony to PRA, they included rights relating to Lester's account. However, since the Court ultimately determines in this opinion that those transferred rights did not include the right to arbitrate, the point is moot.

Lester also argues that: the original agreement between Synchrony and Lester did not include third party debt collectors as parties which could demand arbitration (doc. 19 at 15-16); and the Bill of Sale between Synchrony and PRA merely assigned Lester's receivable, and did not assign the arbitration rights (doc. 19 at 16-21).

8

the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract[.]" UTAH CODE ANN. § 70A-9a-404(a). PRA insists that this Court should be guided by the Sixth Circuit's application of that statute in *Stratton v. Portfolio Recovery Assocs., LLC*, 706 F. App'x 840 (6th Cir. 2017).[5]

The issue in *Stratton* was whether PRA violated the FDCPA by filing a lawsuit in a Kentucky state court which set out a claim for prejudgment interest on a defaulted credit card debt.[6] The credit card in *Stratton*, as in the instant case, was a Lowe's credit card, issued by GE to Dede Stratton. Also like in the instant case, PRA purchased the debt after it was "charged off" by GE. Under Kentucky law, PRA could not collect the interest it sought. However, the credit card agreement in *Stratton*, like the agreement in the instant case, provided that Utah law applied, and for interest at

---

[5] Neither party has cited, and this Court has not found, binding Eleventh Circuit precedent on this issue.

[6] The Sixth Circuit noted:

The only question before this court is whether [PRA] violated federal law by attempting to collect prejudgment interest of 8% per annum on a credit card debt in a Kentucky state-court collection action. [PRA] has not changed its position in its subsequent pleadings or briefs that it was entitled to collect the original card debt of $2,630.95, with interest thereon at the rate of 8% per annum from December 19, 2008 until date of judgment with 12% per annum thereafter until paid, plus court costs.

*Stratton*, 706 F. App'x at 841 (internal quotations omitted).

9

the rate of 21.99% per annum.

The first issue in *Stratton* was whether the credit card agreement was properly admitted by the district court.[7] The plaintiff argued that it was hearsay and should not have been admitted. The Sixth Circuit noted that

> Portfolio supplemented this Credit Card Agreement with an affidavit by Portfolio's Senior Vice President of Core Operations, Tara Privette. Privette attested to Portfolio's debt purchasing process, whereby some documents associated with the accounts are transmitted directly from banks to Portfolio, while others are held by the bank until Portfolio requests them. After Stratton, who no longer had her copy of the Agreement, submitted a discovery request to Portfolio, Portfolio sent a request to GE for a copy of Stratton's Agreement pursuant to Portfolio's practice with GE. GE obliged, and Privette verified that the document was consistent with the rest of the records applicable to Stratton's account.

*Stratton*, 706 F. App'x at 844. The court held that the credit card agreement was properly admitted because

> [t]he affidavit by Privette is sufficient to establish her reliability as a custodian of the Credit Card Agreement. *See United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003) ("[The] information must be presented through the 'testimony of the custodian or other qualified witness[.]' ")

---

[7] The Court discusses this portion of the *Stratton* opinion only because at the hearing PRA argued that *Stratton* stood for the proposition that the mere statement by Koehler in her declaration that PRA purchased the "account" was enough for the this Court to determine, absent evidence to the contrary, that PRA was also assigned the rights under the arbitration provision. Because *Stratton* was neither cited nor discussed in PRA's brief, the Court can only assume that this is the portion of the opinion which PRA is referencing. No part of *Stratton* stands for the position asserted by PRA. Although the case <u>does</u> provide support for the position that Koehler can authenticate the underlying contracts in this case, which she did, so that they are admissible, no challenge to admissibility has been made.

10

> (quoting FED. R. EVID. 803(6)). Privette attested to the routine procedures followed in obtaining a document from an original creditor and the document transfer process specifically between GE and Portfolio. The business records exception does not require that a custodian have personal knowledge, but only that she "be familiar with the company's recordkeeping practices." *See Fambrough v. Wal-Mart Stores, Inc.*, 611 Fed.Appx. 322, 328 (6th Cir. 2015). While Privette did not create the document, she is familiar with Portfolio's record-keeping practices and qualifies as a custodian of the records in Stratton's account. *See id.* Further, she attested that she requested and received the contract from GE. Accordingly, the district court properly admitted the Agreement.

*Id.*[8]

The next issue in *Stratton* was what exactly was assigned to PRA by GE. The plaintiff in that case, as the Plaintiff in the instant case does, argued that the Bill of Sale only transferred "receivables," not the account itself.[9] The court then reviewed the "Forward Flow Receivables Purchase Agreement's" definitions of "account" and

---

[8] The Sixth Circuit also wrote that "Stratton fails to make convincing arguments why this Credit Card Agreement is an unreliable record of her contract with GE." *Stratton*, 706 F. App'x at 844.

[9] The Bill of Sale read, in pertinent part:

> Seller hereby transfers, sells, conveys, grants, and delivers to Buyer, its successors and assigns, without recourse except as set forth in the Agreement, to the extent of its ownership, *the Receivables* as set forth in the Notification Files (as defined in the Agreement), delivered by Seller to Buyer....

*Stratton*, 706 F. App'x at 845 (italics in original). This is the exact language used by the Bill of Sale in the instant case.

"receivable."[10] Finally, the court concluded:

> It is clear that Portfolio is an assignee of GE <u>for the purpose of collecting the debt</u>. The rights of assignees are generally subject to all the terms of an agreement between the debtor and the assignor unless explicitly limited in the agreement. *See* U.C.C. § 9-404 ("the rights of an assignee are subject to all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract")[11]; KRS 355.9-404; *see also Martin v. Cavalry SPV I, LLC*, 2014 WL 1338702 at *6 (E.D. Ky. March 31, 2014). Stratton's original Credit Card Agreement with GE states, "[w]e may sell, assign or transfer any of our rights or obligations under this Agreement or your Account." The Forward Flow Agreement between GE and Portfolio states that "Seller shall sell and Buyer shall buy all right, title and interest in and to the Receivables...." GE's rights, title, and interest in and to <u>the Receivables</u> included the Utah choice-of-law provision. That is, if GE was seeking to collect the amount owed by Stratton, it would be entitled to the benefits of Utah law. We therefore conclude that Portfolio now stands in GE's shoes as

---

[10] The court noted that that agreement

defines "receivable" and "account" separately, defining "receivables" in a circular manner as "any retail credit card receivable relating to an unsecured credit card account owned by Seller that is being sold to Buyer pursuant to the terms of this Agreement," and "account" as "any retail credit card account owned by Seller with respect to which there is a [r]eceivable."

*Stratton*, 706 F. App'x at 845. Finally, the court noted:

Because the agreements refer only to the transfer of "the [r]eceivables," Stratton argues that we should interpret "receivable" according to its plain meaning. Stratton asserts that we should look to BLACK'S LAW DICTIONARY, which defines "receivable" as "an amount owed, esp. by a business's customer."

*Id.* at 845 (citing BLACK'S LAW DICTIONARY (10th ed. 2014)).

[11] As noted, at the hearing, PRA cited this statute, the full citation for which is UTAH CODE ANN. § 70A-9a-404.

an assignee of the right to collect Stratton's debt. See Restatement (Second) of Contracts § 325 cmt. a (1981) ("The creditor typically delivers to the assignee a written instrument addressed to the debtor directing the debtor to pay all or part of the debt to the assignee ... The writing is an assignment.") (emphasis added).

> Since Stratton's signed contract with GE is the basis of her debt, and is therefore the basis of her claim against Portfolio, the rights and obligations of that contract should continue with the assignment. *See Sears, Roebuck & Co. v. Lea*, 198 F.2d 1012, 1015 (6th Cir. 1952). Stratton cannot pick and choose which provisions of that contract are enforceable. *See id.* GE's contractual rights and obligations under the Credit Card Agreement transferred to Portfolio.

*Stratton*, 706 F. App'x at 845–46 (emphasis added).

Finally, the Sixth Circuit determined that the credit card's choice of law provision, which called for the use of Utah law, was binding, and held

> We conclude that the application of the choice-of-law provision is dispositive in this case. Utah law applies and Portfolio did not violate the Fair Debt Collection Practices Act. As the assignee of the right to collect Stratton's credit card debt, Portfolio received the rights and obligations arising from Stratton's original credit card contract, including the right to invoke the Utah choice-of-law provision. The rights of Portfolio as assignee are subject to all terms of the agreement between the account debtor and the assignor. Accordingly, the Utah choice-of-law provision applies, and under Utah law Portfolio was entitled to file a collection action for prejudgment interest in Kentucky state court without violating the Fair Debt Collection Practices Act.

*Id.* at 841–42 (emphasis added).

The Court is not bound by the unreported Sixth Circuit decision in *Stratton*.[12]

---

[12] The Court can find no case which has cited it.

13

Furthermore, the Court finds *Stratton* to be unpersuasive. Although the Sixth Circuit held that, pursuant to Utah law, PRA's rights "as assignee" were "subject to <u>all</u> terms of the agreement between the account debtor and the assignor," *id.* at 841–42 (emphasis added), including the Utah choice of law provision, the court also made it clear that PRA was an assignee of the right <u>to collect the debt</u>. It makes sense then that rights arising from contractual provisions which would aid in "collection of the debt" would have been transferred. However, it goes too far to assume that the Sixth Circuit's decision also stands for the proposition that an assignee of the right to collect a debt would also receive the assignor's right to demand arbitration. That was not an issue before the Sixth Circuit, and this Court sees *Stratton* as limited to the facts which were before the Sixth Circuit in that case.

*Garcia v. Midland Funding, LLC*, No. CV 15-6119-(RBK/KMW), 2017 WL 1807563 (D.N.J. May 5, 2017), *appeal dismissed*, No. 17-2104, 2017 WL 5664865 (3d Cir. Oct. 13, 2017) (Kugler, J.), a case cited by the Plaintiff, is instructive on this point. *Garcia*, like the instant case, involved a Lowes credit card account, issued by GE, which went into default. The credit card agreement, also like the Agreement in the instant case, contained an arbitration provision. Midland Funding, LLC ("Midland") entered into a "Forward Flow Receivables Purchase Agreement" with Synchrony, which it contended "fully conveyed [the] ownership of [the] credit

14

account to [Midland], which included [the] right to elect binding arbitration to resolve most disputes between the parties." *Garcia*, 2017 WL 1807563, at *3. The Court disagreed, writing:

> The Court finds that, even with a "healthy regard for the strong federal policy in favor of arbitration," <u>the [Forward Flow Receivables Purchase Agreement] did not clearly convey the right to demand individual arbitration in the instant case from [Synchrony] to Defendant</u>. *John Hancock Mut. Life Ins. Co.*, 151 F.3d at 137. The Agreement provides separate definitions for "Account" and "Receivable." "Account" refers to "any credit account owned by Seller with respect to which there is a receivable." *Burger Affidavit*, Ex. A § 1.1. "Receivable" refers to "any credit account receivable that is being sold to Buyer pursuant to the terms of this Agreement as such receivable exists as of the Cut-Off Date, to the extent such receivable is set forth on the applicable Notification File." *Id*. The Agreement's Purchase and Sale Clause states, "Seller shall sell and Buyer shall buy all right (including the right to legally enforce, file suit, collect, settle or take any similar action with respect to such Receivable), title and interest in and to the Receivables with respect to which Buyer has received a Notification File." *Id*. § 2.1. As previously noted, the effective account agreement notes that [Synchrony] may assign, transfer, or sell any or all rights associated with Plaintiff's credit account. <u>The Agreement certainly passed the "Receivables" and associated rights from [Synchrony] to Defendant, but the Court does not find that the Agreement transferred all of the rights associated with Plaintiff's account to Defendant. Defendant received rights associated with the Receivables</u>. Defendant acquired the right to collect the receivable, the right to bring an action to collect the receivable, etc., but the Agreement does not, on its face, convey the broad right to compel arbitration for "any dispute or claim" relating to Plaintiff's Account. Koehler Affidavit, Ex. B. <u>The right to compel arbitration for Plaintiff's FDCPA claim is not associated with legally enforcing, filing suit, collecting, settling, or a similar action with respect to the receivable. Therefore, Defendant's motion to compel arbitration will be denied</u>.

15

*Id.* at *3 (emphasis added).

At the end of the day, Koehler's declaration does not define "account," nor does it state that the intent of the parties was to convey to PRA all of Synchrony's rights and privileges under the credit agreement. The declaration also contradicts the Bill of Sale attached thereto, which purports to convey only "receivables." PRA has cited no evidence that the right to arbitrate was transferred, or that it was Synchrony's intent to transfer to PRA the right to arbitrate. *See*, *Sprayberry v. Portfolio Recovery Assocs.*, LLC, No. 3:17-CV-00112-SB, 2018 WL 1789423 at *5-6 (D. Or. Apr. 11, 2018) (Beckerman, M.J.) ("Had GE Bank intended to grant a future debt collector the benefit of its arbitration clause, it was free to include 'debt collector' or 'purchaser of account' or 'anyone connected with' GE Bank in its arbitration clause, similar to other issuing banks. . . . Alternatively, GE Bank could have taken care to effect an assignment of its receivables or consumer accounts to PRA in its Purchase and Agreement or its Bill of Sale."). Although a Forward Flow Receivables Purchase Agreement is referenced in the Bill of Sale, no such document appears in the record, so the Court cannot determine whether it provides any guidance. Accordingly, on these facts, and in light of the Defendant's underdeveloped argument on this issue, the Court **HOLDS** that Synchrony only transferred to PRA the right to collect Lester's receivable. Because the right to compel arbitration for the Plaintiff's claims

is not associated with legally enforcing, filing suit, collecting, settling, or a similar action with respect to the receivable, the Court cannot hold that Utah Code Ann. § 70A-9a-404, or any other (un-cited) provision of Utah law, operates to give PRA the right to arbitrate the claims in this case. The Motion is **DENIED**.

    **DONE** and **ORDERED** this 11th day of July, 2018.

                                      **VIRGINIA EMERSON HOPKINS**
                                      United States District Judge