1
FILED
2018 Aug-06  AM 08:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

1  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF ALABAMA
2  EASTERN DIVISION

3

4  WILLIAM LESTER, JR.,          *        1:18–CV–267–VEH

5        PLAINTIFF,              *

6           V.                   *        June 20, 2018

7  PORTFOLIO RECOVERY ASSOCIATES, *        2:00 p.m.
   LLC.,
8                                *        Birmingham, Alabama
         DEFENDANT.
9  *****************************************************************

10

11                REPORTER'S OFFICIAL TRANSCRIPT OF
12                    HEARING ON MOTION

13

   BEFORE THE HONORABLE VIRGINIA EMERSON HOPKINS
14              UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20  COURT REPORTER:

21
    Julie A. Martin, RMR, CRR
22  Federal Official Court Reporter
    1729 Fifth Avenue North, Ste 325
23  Birmingham, Alabama  35203

24

25

```
 1                          * * * * *

 2                    A P P E A R A N C E S

 3                          * * * * *

 4    FOR THE PLAINTIFF:

 5    John G. Watts
      WATTS AND HERRING LLC
 6    301 19th Street North
      Birmingham, AL 35203
 7
      M. Stan Herring, Jr
 8    WATTS & HERRING LLC
      301 19th Street North
 9    Birmingham, AL 35203

10

11    FOR THE DEFENDANT:

12    Ethan Geoffrey Ostroff
      TROUTMAN SANDERS LLP
13    222 Central Park Avenue, Suite 2000
      Virginia Beach, VA 23462
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          * * * * *

2                      P R O C E E D I N G S

3                          * * * * *

4          THE COURT:  Good afternoon.  The matter before the

5    Court is Lester versus Portfolio Recovery Associates, LLC, Case

6    Number 18-267.  We're here on the defendant's opposed motion to

7    stay or dismiss proceedings and compel arbitration, Document

8    16, and the plaintiff has responded.  So I always let the

9    movant go first.

10         MR. OSTROFF:  Thank you.  If it please the Court,

11   it's nice to be back here again with you.

12             So, from our perspective, Your Honor, these types of

13   cases start and review through the federal policy in favor of

14   arbitration.  And so from our perspective, when you consider

15   that presumption of arbitrability and that it can only be

16   overcome when a court can say with positive assurance that the

17   arbitration clause is not susceptible to an interpretation that

18   covers this dispute, doubts have to be resolved in favor of

19   coverage of the arbitration clause.  Any ambiguities have to

20   resolve in favor of arbitration.  And this presumption -- and

21   these are from Supreme Court cases like Moses H. Cone and AT&T

22   Tech.  This presumption is particularly applicable where you

23   have a clause that's broad like you have here.

24             So, when you talk about doubts concerning

25   arbitrability should be resolved in favor, we look here at the
```

1    first prong of sort of the two-prong test, which is what is the

2    agreement.  And from our perspective, we have satisfied our

3    evidentiary burden to establish that Portfolio Recovery

4    Associates -- and I may refer to them as PRA during today's

5    hearing, so I wanted to make sure I did make that known on the

6    record -- that PRA purchased this account from Synchrony.

7          I think there's been a little bit of glossing over of

8    the declaration from the individual from Synchrony about that.

9    She specifically says -- and her testimony is admissible,

10   although I understand there's some objection from plaintiff's

11   counsel, but her testimony is certainly admissible under the

12   business records exception to the hearsay rule, and her

13   testimony based upon those business records is also admissible.

14         She specifically says that PRA bought this account.

15   This account was sold by Synchrony Bank to PRA.  When that

16   happens, PRA gets all the rights, titles and interests to the

17   account.  That includes the arbitration provision.  We stepped

18   into the shoes of Synchrony in this situation.  All the same

19   contractual requirements apply.  And we are entitled to seek

20   arbitration of this particular claim because it arises out of

21   the account.

22         And that's the language that the arbitration

23   provision uses is the account, relating to the account.  So

24   from --

25         THE COURT:  Which arises out of or relating to or

1  both?

2          MR. OSTROFF:  I'm sorry.  The specific language is

3  that relates to your account.

4          THE COURT:  So it doesn't say arise out of?  So that

5  was simply a synonym you were using?

6          MR. OSTROFF:  That's correct, Your Honor.

7          THE COURT:  So the actual language is relates to your

8  account.  Did I repeat you correctly?

9          MR. OSTROFF:  That's correct, Your Honor, the actual

10  language is if it relates to your account, and we certainly

11  believe that this lawsuit relates to Mr. Lester's account.

12          THE COURT:  And why don't you tell me a little bit

13  more about why -- first of all, you said what is the agreement,

14  and then you said PRA purchased the account.  So now I'm

15  wondering what your referring to by the agreement.  Are you

16  talking about the sale agreement, because you were talking

17  about the arbitration clause also?

18          MR. OSTROFF:  In the first prong of this analysis,

19  you look to the question of what does the agreement say.

20          THE COURT:  Which agreement?  There's a sale also.

21          MR. OSTROFF:  The arbitration agreement.

22          THE COURT:  Thank you.  So when you say what is the

23  arbitration agreement, you mean what is the language of the

24  arbitration agreement?

25          MR. OSTROFF:  That's correct, Your Honor.

1          THE COURT:  Okay.  Just a moment.  Because you then

2    said in answering your own question, you said PRA purchased the

3    account.  So that has nothing to do with what is the language

4    of the arbitration agreement.

5          But let's go to the language of the arbitration

6    agreement.  Where in your brief have you given me authority

7    that relates to your account applies to a falsely -- allegedly

8    falsely asserted debt that's false because of a settlement?

9          MR. OSTROFF:  Well --

10          THE COURT:  In other words, I see this almost as a

11    breach of a settlement agreement.  Let me back up a minute.

12    This is how I kind of see it, and I'm going to tell you so that

13    you can then explain to me why you agree with me or disagree

14    with me.

15          MR. OSTROFF:  Certainly.

16          THE COURT:  And the why is really important.

17          MR. OSTROFF:  Certainly.

18          THE COURT:  Say I had a diversity personal injury

19    case in front of me.  The amount in controversy would have to

20    be more than $75,000 in order for me to have jurisdiction.  So

21    everybody agrees the case is worth $100,000.  The case is

22    settled for $100,000.  And I dismiss the case as settled, and I

23    lose jurisdiction.  There's a stipulation of dismissal filed.

24          Then the person who is going to pay the money pays

25    $50,000 but doesn't pay the rest of it.  So 50,000 is owed.  If

1   the plaintiff in the personal injury case wants to sue -- it's

2   probably an insurance company at this point -- wants to sue the

3   person they settled with who did not make the payment, they

4   would have to sue them in state court without regard to -- even

5   if there's complete diversity, because you don't have -- the

6   case of controversy is less than $75,000.  Do you -- that's --

7        MR. OSTROFF:  I understand your hypothetical, Your

8   Honor.  I don't think --

9        THE COURT:  But see why I think it's similar is

10  because here we've got -- or it may be similar -- we've got an

11  agreement between the plaintiff and Lowe's credit agency or

12  whatever -- anyway, I guess I'll call it the store.  How's

13  that?  An agreement between the plaintiff and the store, and it

14  contains an arbitration clause.

15       And then the plaintiff may not have paid everything

16  it owed the store under the credit agreement, and the store

17  wrote off the credit account, and the store sold the credit

18  account.  You've told me they sold the account or that PRA

19  purchased the account.  They say the receivable, not the whole

20  account, but anyway.

21       So you say you purchased the whole account, so every

22  right -- the debt collector purchases every right that the

23  store had, including the arbitration right.  And then the

24  customer or the plaintiff here calls up the attorney for the

25  debt collector, and they agree to a settlement, and the

1  plaintiff performs under the settlement.  And now apparently

2  the -- doesn't that just end the dispute about the credit?

3       And then what happens next is similar to the breach

4  of the settlement agreement in my personal injury case, in that

5  now when the person, the debt collector, reports to various

6  credit unions that there is an amount of money owed by the

7  plaintiff to the debt collector, why isn't that a stand-alone

8  violation?

9       MR. OSTROFF:  Because it's the same account, Your

10  Honor.  When they submit that dispute to the credit reporting

11  agencies they have to identify the underlying account.  I'm

12  disputing this account with Portfolio Recovery, the same

13  account.  The account still exists.

14       Even after you settle and pay off an account, for

15  example, you still have it on -- you still have it on your

16  credit report.  It's still there as an account in your trade

17  line with a trade line number.  And even under the law and the

18  Fair Credit Reporting Act, that account can appear on your

19  credit report even after it's paid in full and closed for seven

20  years and 180 days.  It's still an account.

21       THE COURT:  Calm down, okay?  Chill.  Saying it

22  exists because it exists is real circular.  I mean, I don't

23  have to dismiss the federal case.  They still can't bring it in

24  front of me.  So you're not giving me a reason why.  You're

25  just saying it is because it is, Judge.

1            MR. OSTROFF:  Well, let me try again, Your Honor, and

2    I apologize.  Whether or not there was a settlement of the

3    underlying lawsuit does not change whether or not an account

4    still exists.

5            THE COURT:  Right.  I agree with you that that

6    doesn't, but what it does change is whether or not the dispute

7    relates to the account or does the dispute relate to the

8    settlement.

9            MR. OSTROFF:  Fair enough, and I would suggest that

10   it still relates to the same account because here they're

11   saying you said things to the credit reporting agencies about

12   this account, the same account, that are incorrect.  I'm

13   disputing the way you're reporting this account, the same

14   underlying account, to the credit bureaus because you're saying

15   the account still has a balance, and I'm saying it doesn't.

16           They're saying that's a false representation.

17   They're saying we failed to investigate whether or not the

18   account had been paid in full to the settlement or not.

19           Their theory obviously is, when we did the

20   investigation on the account, which must exist for us to do the

21   investigation and respond to the credit dispute, we did it

22   wrong.  And what they're saying is we did it wrong because we

23   didn't realize there had been a settlement and dismissal of the

24   lawsuit.  And, therefore, the account should be identified as

25   having been settled for the full balance.

1    THE COURT:  Right, they do say that.

2    MR. OSTROFF:  And that all leads to the conclusion

3    the account still exists.  The account does not go away through

4    a settlement, Your Honor.

5    THE COURT:  I think you're getting hung up on -- I'm

6    on relates to.  I'm not on the existence or nonexistence of an

7    account.

8    MR. OSTROFF:  Well, this lawsuit certainly relates to

9    the account.  They're saying we're credit reporting incorrectly

10   on the account after this settlement and dismissal of the state

11   court lawsuit.

12   THE COURT:  Is that what the -- is that what the law

13   prohibits is false statements regarding an account, or is it

14   false statements regarding a consumer?

15   MR. OSTROFF:  It's about the account, Your Honor.

16   THE COURT:  Is that what the law says?

17   MR. OSTROFF:  When you make statements about the

18   consumer to a credit reporting agency, your statements are

19   about the account for that consumer.  You report a trade life

20   with the account.

21   THE COURT:  Yeah.  It's not that I'm stupid.  It's

22   that -- I mean, I'll have to pull the act because I really

23   haven't looked at this to see, but I would assume that the law

24   is written to prohibit false statements about a consumer, not

25   false statements about an account.

1          For example, like I'm pretty sure there's an innocent

2    typo type -- say if you had the wrong account number on there,

3    but he actually owed the money, I'm not sure that would be

4    actionable.  In other words, say his account number ends in

5    1004 and somebody reports it as 1009 because fours and nines

6    can look alike if they're written by hand.  So say somebody,

7    the debt collector, reports to TransUnion that this debtor owes

8    $3,000 and identifies the account as ending in 1009.  And, in

9    fact, the debtor owes the debt collector $3,000, but the

10   account number is not 1009.  It's 10094.  I don't really think

11   that would be actionable because the language -- they had to

12   put the language in there to make it non-actionable because

13   it's just a typographical, not material error, innocent error.

14   I may be making that up as being an exception, but I seem to

15   remember a case like that.

16        MR. OSTROFF:  I'll just point you to the complaint,

17   Your Honor.  Their allegations starting in Paragraph 56 in the

18   complaint are about the Experion credit report says a balance

19   owed on the account.  Under the payment status, the account is

20   listed as seriously past due.  Defendant PRA updated this

21   account.  This was long after the debt was settled and

22   released.

23          I mean, that's all about -- and then there's a note

24   that you pay off 25 percent of your personal account.

25   Plaintiff did not pay a portion of what was owed.  He paid off

1   the account.  So I guess –– and I apologize if I'm not directly

2   answering your concerns from what I understand to be whether or

3   not we're still –– this lawsuit relates to the account.

4         I'm trying to do that by trying to use the examples

5   of their own words from the lawsuit, but also how the process

6   works for doing credit reporting.  When you do credit

7   reporting, you do it –– you send in information to the credit

8   reporting agencies.  That obviously has to identify a consumer,

9   but it's with an account number, and so you're tying the

10  consumer with that account.

11        And so, for example, in this situation, right,

12  they're saying your reporting of the account was incorrect

13  because you didn't update to show it had been paid in full or

14  settled for less than the full balance is probably what it

15  should be.  And you're erroneously reporting something about

16  this account.

17        So the account still then exists at that point, and

18  their dispute relates to the account because it's specific to

19  this particular account bought by PRA from Synchrony and how

20  it's being reported to the credit bureaus and what the credit

21  bureaus are showing as the account status; is it past due, is

22  there a balance owed or has it been settled for less than the

23  full balance, and there's no money owed, it's not late anymore.

24        Page 8 of the complaint, the title is Plaintiff

25  disputes the PRA account to the credit bureaus.  The letter

1  states that –– this is plaintiff's letter.  The letter states,

2  "You are reporting an account from Portfolio Recovery

3  Associates, LLC, with a balance of approximately $3,046.

4  Please investigate this, as I do not owe this company any

5  money."

6          THE COURT:  Okay.  Let's move on.  Thank you.  You

7  said that the business records exception makes the declaration

8  in support of the assertion that PRA purchased, and here in

9  court you said the account, admissible and my question is but

10  does admissible equal sufficient.  I don't think they said I

11  can't consider it.  They simply said it's not enough.

12          MR. OSTROFF:  And that's a good point, Your Honor.

13  It is sufficient because it's the only evidence in the record.

14  They've come forward with no evidence.  So the unrebutted

15  evidence, as stated in Paragraph 14, of the Koehler declaration

16  is ––

17          THE COURT:  Koehler, you mean the person who signed

18  the declaration?

19          MR. OSTROFF:  Yes, ma'am.

20          THE COURT:  The affidavit declaration.

21          MR. OSTROFF:  The declaration of Martha A. Koehler,

22  and she provided this declaration on behalf of Synchrony bank.

23  And she says in paragraph 14, "Synchrony sold the account to

24  Portfolio Recovery Associates, LLC, in June of 2016.

25          THE COURT:  But she also says –– she references

1  documents that are supposedly attached that aren't, the

2  plaintiff says.

3       MR. OSTROFF:  Well, I think there's a reference in

4  that same paragraph to saying the account was one of the

5  accounts sold by Synchrony to past Portfolio Recovery under the

6  bill of sale and an affidavit of sale of account, attached

7  hereto as Exhibit G, and that's just a typographical error.  I

8  don't know that there's an affidavit of sale of account that

9  exists, but the bill of sale is there and the bill of sale,

10 based upon her testimony and her authentication of that

11 document as a business record, is admissible testimony.

12      THE COURT:  Well, it makes -- okay.  It makes the

13 business record admissible, but the question is whether or not,

14 without providing the record that is identified, am I supposed

15 to just accept everything in this declaration as true.  And

16 you're saying, well, they haven't contradicted it, but the

17 thing about it is is how can they prove a negative?  If this

18 wasn't transferred, how are they supposed to prove it?

19      MR. OSTROFF:  Well, they certainly could have asked

20 to go do discovery and take a deposition.

21      THE COURT:  Okay.  Let me look at the declaration.

22      (Brief pause)

23      THE COURT:  She's reviewed relevant business records,

24 including those annexed, but that's not limited to that.  I see

25 at Paragraph 14 when she references bill of sale and affidavit

1    of sale of account annexed hereto as Exhibit G, but Exhibit G

2    consists of a one page document entitled bill of sale.  You're

3    saying --

4            MR. OSTROFF:  I think it was just a typo, Your Honor.

5            THE COURT:  What would be an accurate statement?

6            MR. OSTROFF:  Under the bill of sale annexed hereto

7    as Exhibit G.

8            THE COURT:  So you believe that the manager of

9    litigation support for Synchronicity, or however their name is

10   said, Synchrony in an affidavit, which may or may not be fairly

11   standard as part of her -- it may be pretty much what we call

12   boilerplate in terms of bullet points to hit -- that there's

13   simply no such thing as an affidavit of sale of account?

14           MR. OSTROFF:  That was a typo in this declaration.

15   It wasn't something that was intended to be attached as Exhibit

16   G.  I'm not aware of.

17           THE COURT:  A typo is you put the comma in the wrong

18   place.  One, two, three, four, five, six words is not a typo.

19   It's an error, but a typo -- it's more than a scrivener's

20   error.  If this were a deed, this would be way more than a

21   scrivener's error.

22           I mean, you can't put language into something that

23   has meaning and then say, well, I, the attorney, am going to

24   sit here and tell you that that's just a typo.  This manager of

25   litigation support just signed something that she -- and even

1    though these words are directly above her signature and,

2    therefore, prominent visually, that doesn't mean that.

3             MR. OSTROFF:  Well, Your Honor, clearly, there was an

4    error; but, regardless, I don't think it's material to the

5    question of whether or not the evidentiary burden has been

6    satisfied.

7             THE COURT:  Well, I think it is.  And I think that

8    matters, because the bill of sale simply says, which is

9    Document 17-1 in the court file, simply says, for value

10   received and all that, Synchrony Bank, the seller, transfers,

11   sales, conveys, grants and delivers to Portfolio Recovery

12   Associates, its successors, and assigns, without recourse

13   except as set forth in the forward flow receivables purchase

14   agreement, to the extent of its ownership, the receivables --

15   it doesn't say the account.  It says the receivables.  And this

16   matters only because -- well, it matters because the plaintiff

17   has challenged it -- the receivables as set forth in the

18   notification files, as the term notification files is defined

19   in the agreement, or maybe it's the receivables that were

20   defined in the agreement.  But I have a feeling that

21   notification files is defined in the agreement, and then maybe

22   in the notification files receivables is delivered. CHECK CHECK

23   last sentence

24            And they challenge that as being insufficient because

25   it's only the right to payment.  It's not all rights under the

1  agreement or at least it's not shown to be all rights under the

2  original agreement, the credit holder agreement.

3          MR. OSTROFF:  And we think they're wrong, Your Honor,

4  particularly because the declaration itself says they sold the

5  account.

6          THE COURT:  Well, I can read, and you tell me that

7  the second document doesn't exist.  The affidavit of sale of

8  account doesn't exist, so the account was one of the accounts

9  sold by Synchrony under the bill of sale, and the bill of sale

10  says receivables.  And she's got account capitalized, so let's

11  go back and see what she means by account.

12          MR. OSTROFF:  Yes, Your Honor.  She defines account

13  in her declaration.

14          THE COURT:  Well, usually capitalized words are.

15          MR. OSTROFF:  It's defined, Your Honor, in --

16          THE COURT:  Paragraph 6.

17          MR. OSTROFF:  Correct.

18          THE COURT:  And it's defined as the credit card

19  account between Lowe's/Synchrony to William L. Lester, Junior,

20  in account number ending 4658.

21          I guess what I'm getting to is, absent the business

22  record that she relied on, is her declaration, which, I mean,

23  they're saying it's not sufficient because, I guess, of this

24  discrepancy in language between account and receivables.

25          MR. OSTROFF:  Well, I think they are two separate

1   things.

2          THE COURT:  You think an account and receivables are

3   two separate things?

4          MR. OSTROFF:  I think in the way they're being used

5   here, they could have -- yes, they have two separate meanings.

6          THE COURT:  Okay.  Tell me what the meanings are.

7          MR. OSTROFF:  Black's Law Dictionary actually defines

8   them differently.  Black's Law Dictionary defines a receivable

9   as the name of an account which reflects a debt due.  An

10  account is defined as a detailed statement of the debits and

11  credits between parties to a contract or to a fiduciary

12  relationship.

13         THE COURT:  Okay.  Receivable is the name of an

14  account, is that what you said Black's says?

15         MR. OSTROFF:  A name of an account which reflects a

16  debt due.

17         THE COURT:  Okay.  And account is defined as what?

18         MR. OSTROFF:  A detailed statement of the debits and

19  credits between parties to a contract or to a fiduciary

20  relationship.

21         THE COURT:  Okay.  So, is what you're saying there

22  that she, Ms. Koehler's, K-O-E-H-L-E-R, declaration says that

23  Synchrony sold to PRA all of the debits and credits between it

24  and Mr. Lester, the plaintiff, in not nearly the amount that

25  was due to Synchrony from Mr. Lester?  Is that what you're

1    trying to say?

2           MR. OSTROFF:  No.  What I'm saying is they sold the

3    account, Your Honor, and included within the account is the

4    receivable.  This is a descriptive name of a charged-off

5    account being sold with outstanding debts.

6           THE COURT:  I will take that as a yes.

7           MR. OSTROFF:  It's just to distinguish those accounts

8    that were not charged off and not being sold from those that

9    were.

10          THE COURT:  To distinguish accounts that were not

11   being sold from those that were?

12          MR. OSTROFF:  Correct, Your Honor, because --

13          THE COURT:  What accounts were not being sold?

14          MR. OSTROFF:  Ones that were not part of the

15   transaction, Your Honor.  Clearly, Synchrony has millions of

16   accounts that aren't being sold here.

17          THE COURT:  Right.  So I'll get back to my original

18   question -- well, not original.  It's one of my questions.

19   Just because Ms. Koehler says it, does that establish it?  I

20   mean, you're saying it's their burden to prove it doesn't

21   establish it, but I think that -- I don't think that's how it

22   works.  I understand that that would be one way it could be

23   challenged is they could prove it was false, but --

24          MR. OSTROFF:  I think, Your Honor, from my

25   perspective, what I'm saying is we have satisfied the

1  requirements of Federal Rule of Evidence 803(6) by this

2  declaration, and that they have to put on some evidence to the

3  contrary, which they've not done.

4        I would point you to Stratton that the Sixth Circuit

5  decided in 2017, which talks specifically about the

6  admissibility of the credit card agreement in this type of

7  scenario and the statements by an affidavit or a declaration

8  and why those are admissible under 803(6).

9        THE COURT:  All right.  I don't think they're

10  challenging the admissibility of her statements.  They're

11  challenging the sufficiency.  I do know I've said that

12  previously here today.

13        And they're not challenging -- there seems to be a

14  lot of straw men here -- they're not challenging the

15  arbitration clause.  You started out, If the arbitration clause

16  is disputed or challenged, the Court should view it in favor of

17  arbitration.  That's a total straw man.  They're not

18  challenging the arbitration clause.

19        And when people say things to me, and I said this

20  previously when we had our meeting in chambers, I assume

21  they're saying it to me for a reason.  And so when you talk

22  about something that has no relationship to what's actually

23  disputed, I see that as a straw man, and I think why are you

24  knocking down straw men.

25        MR. OSTROFF:  I'm certainly not trying to knock down

1    straw men, Your Honor.

2         THE COURT:  That makes me think you have a weak

3    situation or you wouldn't be knocking down straw men.  You

4    don't need to knock down straw men.  You just need to respond

5    to what's actually at issue.

6         What's at issue is has PRA shown sufficiently that it

7    owns the right to enforce the arbitration agreement, and

8    there's no challenge to the arbitration agreement itself.

9         MR. OSTROFF:  I believe that they're challenging our

10   right to enforce it, and they're also saying, even if we could,

11   it would not apply to these particular claims.

12        THE COURT:  Well, that's the second thing, but I

13   don't have to get to that if you don't have the right -- I

14   think that whether or not the arbitration agreement applies to

15   these particular claims is probably the type of issue that an

16   arbitrator would decide and not the Court.  I don't know.  What

17   do you say to that?

18        MR. OSTROFF:  I think it depends on the language of

19   the arbitration agreement.

20        THE COURT:  Well, under the language of this

21   arbitration agreement, which is in front of me.

22        MR. OSTROFF:  This language of this arbitration

23   agreement I believe says that that's an issue for you to

24   decide.

25        THE COURT:  Okay.  Then that's good to know.  Okay.

1    But I still think the first issue is, unless you just think

2    you've said enough and don't want to go any further with it, is

3    why is a conclusory affidavit sufficient, and you're saying

4    read the Stratton case?

5           MR. OSTROFF:  Well, Your Honor, I was trying to point

6    to a particular case recent in this same context of a question

7    about whether or not PRA, after it purchased an account, had

8    the right to apply that arbitration agreement to a consumer

9    dispute.  And in that particular case, not only did the Court

10   address that and rule in PRA's favor, but it addressed the

11   condition precedent to that, which was the admissibility of the

12   credit card agreement and the admissibility of statements by

13   the declarant that put that credit card agreement into

14   evidence.

15          And I was just trying to point to that case as a

16   helpful way of looking at it to establish that we have

17   satisfied our burden of proof.

18          THE COURT:  But you see, just -- and I'm responding

19   merely to what you said.  You said that that court found that

20   the declaration was sufficient to make the credit card

21   agreement admissible; that the declaration itself was

22   admissible and was sufficient to have the credit card agreement

23   be admitted.

24          MR. OSTROFF:  And for the declarant to testify as

25   well, Your Honor.

1    THE COURT:  Well, I'm just hearing what you said, and

2  now you're adding stuff.  And if you want to add stuff, that's

3  fine.  So it sounds to me like in the Stratton case -- and I

4  don't know without reading it whether or not it mattered to

5  that court -- they actually had the credit card agreement.

6    In this case, what the plaintiff is saying is I don't

7  have the document that says here's what's being transferred

8  from Synchrony to PRA.  That's what I understand them to be

9  challenging.

10    MR. OSTROFF:  I understand them to be challenging

11  whether or not it was the account itself and everything that

12  goes along with that versus just the receivable.

13    THE COURT:  Well, I think they're challenging more

14  than that.  I think they're challenging was this account one of

15  the ones that's listed.  I mean, maybe they're not.  Let me

16  find out.  Are y'all challenging whether or not this is even

17  part of the package that was transferred?

18    MR. HERRING:  Yes, Your Honor, because they have not

19  attached the document that would show whether or not this was

20  one of the actual accounts that was transferred.

21    THE COURT:  And so at least I didn't make that up.

22  They're challenging whether or not this account is in the

23  package or bundle of accounts, out of all the thousands of

24  accounts that Synchrony has that were transferred to PRA.

25    MR. OSTROFF:  And what I'm saying, Your Honor, is the

1  declaration definitively establishes that.  The declaration

2  says, by it own terms, according to Synchrony's records,

3  Synchrony sold the account, the defined account, Mr. Lester's

4  account, to Portfolio Recovery in June 2006.  The account,

5  defined as Mr. Lester's account, was one of the accounts sold

6  by Synchrony to PRA under the bill of sale.  It's attached as

7  Exhibit G.

8           THE COURT:  And affidavit of sale of account, which

9  is a typo or mistake.

10          MR. OSTROFF:  But from our perspective, Your Honor,

11  it's immaterial.

12          THE COURT:  I understand that from your perspective

13  you argue it's immaterial.  Well, you say it's sufficient

14  because it's sufficient, and you've referred me to Stratton as

15  a helpful case to determine that it's not only admissible,

16  which I don't think anybody has challenged that the declaration

17  is admissible, but that it's sufficient without the underlying

18  document that it attests to the legal effect of.

19          MR. OSTROFF:  That's correct, Your Honor.  This

20  declaration is sufficient and admissible under 803(6).

21          THE COURT:  Admissibility is not an issue.  Why are

22  you setting up such a straw man?  It's not an issue.  They have

23  not challenged the admissibility of her declaration.  They've

24  only challenged its sufficiency.

25          MR. OSTROFF:  We believe it's sufficient, Your Honor.

1   It very explicitly says, this account, Mr. Lester's account,

2   was sold to PRA.

3          THE COURT:  It does state that.  Those words are in

4   Paragraph 14 of the declaration that is Document 17-1.  Well,

5   there's a lot of documents that are 17-1, anyway.

6          And your authority for that is Stratton is helpful?

7          MR. OSTROFF:  That is one authority, Your Honor.

8          THE COURT:  Do you have any others you want me to

9   particularly look at for the sufficiency of a declaration as to

10  the legal consequences of a business record without attaching

11  the business record?

12         MR. OSTROFF:  Your Honor, I would be happy to submit

13  a supplemental briefing on this issue if you would like us to.

14  Off the top of my head, I don't know that I have any additional

15  citations for how you go about satisfying 803(6).

16         THE COURT:  It's not an 803(6) question.  I don't

17  think that any further briefing would be useful, because you're

18  going to brief me on 803(6), and it's not an 803(6) question.

19  Okay.

20         All right.  Let's see what else.  All right.  You've

21  argued that this claim relates to the account, and you've

22  pointed out that that's the language in the arbitration clause.

23  I've stated that I don't view the arbitration clause as being

24  disputed or challenged.

25         You say that the declaration is not only admissible,

1  which he's not challenged, but that it establishes, absent

2  evidence to the contrary, that PRA, in fact, purchased this

3  particular account, and this account does, in fact, include the

4  right to arbitrate.  I don't really want to spend any more time

5  on that, because I think that would be true.

6          And then you say that it doesn't matter that they're

7  upset about a report that is made false by a settlement in

8  their view allegedly.

9          MR. OSTROFF:  I apologize, Your Honor, I didn't catch

10 the last part of that.

11         THE COURT:  It doesn't matter in your view that the

12 plaintiff says that this dispute, this lawsuit, is not subject

13 to arbitration because it doesn't relate to their account

14 because it relates rather to a settlement of this account that

15 then was inaccurately reported.

16         MR. OSTROFF:  Yes.  Our position is whether or not

17 the account, there was a settlement of the account doesn't

18 change the fact that the arbitration clause covers the account,

19 and that they are complaining and filing a lawsuit about ways

20 they believe we inaccurately reported the account to credit

21 reporting agencies.

22         THE COURT:  All right.  I will hear from the

23 plaintiff.  Thank you.

24         MR. HERRING:  Thank you.  May it please the Court.

25         THE COURT:  Sure.  Have I misstated any of your

1    positions by the way?  I should have asked you before.

2              MR. HERRING:  Not that I'm aware of.

3              MR. WATTS:  No, Your Honor.

4              THE COURT:  Are there any additional positions that

5    you've argued that I've overlooked?

6              MR. HERRING:  Yes, Your Honor.  And I'll kind of back

7    up a little bit.  The first position I want to address that

8    we've asserted is not just that the missing document that they

9    didn't supply was the affidavit of sale, and I'll direct Your

10   Honor to -- Kim, how do I get this up?

11             THE COURT:  You ask Kim to turn it on.

12             (Brief pause)

13             THE COURT:  Okay.  So the missing document was the

14   affidavit of sale, and you've been -- you can continue.

15             MR. HERRING:  Yes, Your Honor.  This missing document

16   is, in addition to the affidavit of sale, if Your Honor will

17   look to where I circled, it is what's called the forward flow

18   receivables purchase agreement.  And this is the document --

19   this is the actual contract, Your Honor, between Synchrony and

20   PRA.  And what the bill of sale -- what this document is is

21   this is an exhibit to the forward flow receivables purchase

22   agreement.

23             The additional document, the affidavit of sale of

24   account, is also an exhibit to the forward flow purchase --

25   forward flow receivables purchase agreement, which neither one

1    of those are attached.

2              Now, the forward flow agreement, I thought that --

3    just to make it a little easier -- Your Honor, that is what

4    defines the right to the parties.  It defines the terms.  It

5    defines all the terms in the agreement.  It defines what

6    parties can and cannot do.

7              And that is what is not attached, and that is what

8    they don't want to attach.  They had plenty of time to get that

9    if they wanted to, but they didn't want Your Honor to see that

10   because they know that that does not help them.

11             Now, Your Honor, I have a copy of a forward flow

12   agreement that was entered into between GE and Capital Retail

13   Bank and Portfolio Recovery in December 2011.  There's a

14   website that actually has lots and lots of these different

15   agreements between different companies.  And, Your Honor, if I

16   could approach, I would like to give you a copy of this.

17             THE COURT:  Well, you need to first give a copy to

18   opposing counsel.

19             MR. HERRING:  Sure.

20             THE COURT:  Then I will look at it, and you can

21   explain to me why it matters.

22             MR. HERRING:  May I approach, Your Honor?

23             THE COURT:  Yes.  I don't want to consider it if it

24   doesn't matter.

25             MR. HERRING:  Sure.  So, Your Honor, this is a

1  document that they hold very sacred that they didn't want us to

2  see.  So, this document, first of all, it defines, if you'll

3  look on Page 4, under definitions, this document defines what a

4  receivable is.

5          THE COURT:  It also defines account on Page 1, but

6  okay.

7          MR. HERRING:  Yes, Your Honor.  And we can --

8          THE COURT:  No.  That's okay because the word used in

9  this bill of sale is receivable.

10          MR. HERRING:  And, Your Honor, the importance of this

11  is so these accounts are supposedly sold to PRA subject to the

12  covenants and conditions set forth in the forward flow

13  agreement, and then it goes on to say that the seller hereby

14  transfers, sales, conveys, grants and delivers the receivables

15  as set forth in the notification files.

16          Now, opposing counsel has said, well, there's no

17  difference between the receivables, as I understood it, that we

18  sold the accounts, even though it says receivables here, we

19  really sold the accounts.

20          And opposing counsel was talking about the fact that

21  the declaration in and of itself is enough to win the day for

22  them.  Well, the declaration is directly contradicted by this

23  bill of sale.  This bill of sale, it says, the only thing that

24  PRA bought was the receivables.  That's it.  They didn't by

25  accounts.  They bought receivables.

1          THE COURT:  Well, he's saying receivables is an

2    apple, and account means fruit, and apples are fruit.  So if

3    you buy an apple, you've necessarily bought fruit.

4          MR. HERRING:  Well, that may be what he's saying,

5    Judge, but what I think the difference is -- let's look at

6    account under the terms of this forward flow agreement on Page

7    1.  The account means any credit card account owned by the

8    seller with respect to which there is a receivable.  So a

9    receivable is a smaller part of an account.

10          THE COURT:  And he said that.

11          MR. HERRING:  Right.

12          THE COURT:  It's a subset.

13          MR. HERRING:  Yes, Your Honor.  So they purchased a

14    subset of an account, meaning they didn't purchase an account.

15    They purchased the receivable.  And I think I've cited Your

16    Honor to Page 4.

17          THE COURT:  Yes.

18          MR. HERRING:  And there's an extensive definition of

19    a receivable, but suffice it to say, Your Honor, that's not the

20    whole account.

21          THE COURT:  Okay.  I understand that argument, I

22    think.  You're saying that by choosing to buy only -- or by the

23    parties agreeing that the sale is only of the right to get

24    paid, then other rights such as, and obligations, such as the

25    right to enforce arbitration, and obligations, such as the

1    obligation to extend credit, are not transferred?

2             MR. HERRING:  That's correct, Your Honor.

3             THE COURT:  Now, I think your argument about the fact

4    that they use the magic word "assigned" doesn't get you very

5    far.  Do you want to spend any time on that?

6             MR. HERRING:  Well, Your Honor, there is a difference

7    between an assignment of an account and all the rights in that

8    account and the sale and transfer of just the receivables.

9             THE COURT:  Right.  But the fact that -- that's the

10   first argument, but I thought you were also arguing that

11   because it only says transfer, sell, convey, grant and deliver

12   and doesn't say "and assigns," that that matters.

13            MR. HERRING:  Yes, Your Honor, I was saying that.

14            THE COURT:  But if they said and assigns the

15   receivable, why would you be in a different position?

16            MR. HERRING:  Well, you're right, Your Honor, we

17   would be in the same position because it is just the

18   receivables.

19            THE COURT:  Okay.  So it's not really the lack of the

20   word "assigns."  It's the fact that receivables is different

21   from accounts?

22            MR. HERRING:  Correct, Your Honor.  And I think that

23   the reason I focused on the word "assignment" is because I

24   think there is some case law out there, Your Honor, that will

25   say, if there's an assignment, it's interpreted broadly to mean

1   all the rights.  And I think we've argued this in our brief,

2   but an assignment can be an assignment of less than all the

3   rights.

4         THE COURT:  Well, yeah, and the transfer can be less

5   than all of the rights.  For example, if I lease a piece of

6   real estate, I have an ownership interest, but it's a limited

7   ownership.  But if I buy it in fee simple, then I own -- the

8   seller transfers to me all of his or her rights to that piece

9   of real estate.  So I understand subsets.  Okay.

10        MR. HERRING:  And I think, Your Honor, I had

11  understood part of the argument just to say a blanket we were

12  assigned the account.  And, first of all, that's not a true

13  statement.  They weren't assigned the account, and that's the

14  distinction I was trying to draw.

15        THE COURT:  So your argument is, as to the

16  insufficiency of their evidence to show is at this point in

17  time and show that they have a right to invoke the arbitration

18  clause is evidenced by the -- people make conclusions all the

19  time, so I won't -- but the fact that in Paragraph 14 a

20  document is referenced but not attached, or are you also saying

21  that all that the affidavit does or declaration does is make

22  the missing document admissible if it were provided.  And then

23  I have to look to the document.

24        In other words, why can I not rely on Ms. Koehler's

25  conclusion that the accounts were transferred, assuming there

1    were no conflicts between the bill of sale?  Maybe she didn't

2    attach it either.  So if Paragraph 14 of her declaration,

3    instead of what it actually says, had said according to

4    Synchrony's record, and she says she's reviewed them, Synchrony

5    sold the account, which means Mr. Lester's account with

6    Synchrony, to Portfolio Recovery Associates, LLC, in June 2016.

7    The account was one of the accounts sold by Synchrony -- well,

8    say it just said the first sentence.  Okay.

9         So what if it just said the first sentence and

10   nothing was attached or referenced.  It just says, I reviewed

11   the records, and it's been sold, and this is part of what was

12   left.  Is that insufficient and why?

13        MR. HERRING:  I believe, Your Honor, the best

14   evidence of what happened is the actual document.  So her

15   statement just that they sold the account when, in fact, there

16   are supporting documents that show that -- well, it's a false

17   statement -- but the best evidence of that are the supporting

18   documents that make up her assertion.

19        THE COURT:  Okay.  So you're saying the best evidence

20   rule is what you rely on to show the insufficiency of Paragraph

21   14 if it were just the first sentence?

22        MR. HERRING:  Additionally, Your Honor, the

23   completeness doctrine because -- and I guess you're saying that

24   document is not attached, but the whole forward flow agreement

25   and all that defines what was bought and what was sold.

1      THE COURT:  Well, the completeness rule just says

2  that whenever a person testifies about something, it ought to,

3  in fairness, all of it be considered, and then you can go into

4  all of it, even though you knew some of it was referenced, and

5  at that time, you can require it to be gone into and not wait

6  for cross-examination.

7      But anyway, I think probably your better argument is

8  the best evidence rule, because we know that there is a

9  document, then the person asserting the right should provide

10 the document that establishes ownership of the right.

11     MR. HERRING:  And it's a hearsay statement, Judge.

12     THE COURT:  Well, is it double hearsay because she is

13 testifying, I guess, as a business records custodian, and she

14 says -- and a business record custodian just says this is a

15 business record.  And so now -- but she's also saying -- so she

16 says what's she's found and what she hasn't found.

17     Like in Paragraph 13, she said I have found no record

18 of a notice from Mr. Lester exercising his right to reject the

19 arbitration provision.  And then up above she talks about

20 various records that are reflected that she did find about

21 payments and charges.

22     Then in Paragraph 14, she says, According to

23 Synchrony's records, Synchrony sold the account in June '16 to

24 PRA, and that sale was accomplished under the bill of sale and

25 affidavit of sell of account annexed as Exhibit G to Document

1   17-1, but in fact not annexed.  There's only one document

2   attached, although it could be that the -- you know what, there

3   might not be two documents.

4           We're reading this as though it's two documents, but

5   it might be that the bill of sale and affidavit of sale of

6   account is one title or a one page document.

7           MR. HERRING:  So, Judge, if you'll --

8           THE COURT:  I'm just saying.

9           MR. HERRING:  Sure.  And they have a lot of different

10  names for similar type documents.

11          In the forward flow agreement, if Your Honor --

12          THE COURT:  The sample?  Okay.

13          MR. HERRING:  The sample.  If Your Honor will turn to

14  Page 27.  So that document is entitled at the top, Exhibit A,

15  bill of sale.

16          THE COURT:  Right.

17          MR. HERRING:  And it's almost verbatim identical to

18  the one in this case.  And so looking beyond that, I think on

19  Page 34, the 34 numbered at the bottom.

20          THE COURT:  Right.

21          MR. HERRING:  This is the affidavit of sale.

22          THE COURT:  Right.  It is a separate document in this

23  exemplar.

24          MR. HERRING:  Yes, Your Honor.  And John and I have

25  been -- and I guess this isn't admissible evidence -- but when

1   we defend these cases, a lot of times the debt collector might

2   come in and attach the bill of sale, the affidavit of sale, and

3   then they'll attach the document showing what accounts were

4   actually transferred.  And there will be an item identifying

5   our client's account, if it's in there.  And so that's a whole

6   separate document that they haven't shown that this account was

7   actually purchased.

8           THE COURT:  Right.  And in my transactional

9   experience, that's because it's as of the closing date and all

10  these documents get drafted and negotiated in advance, and then

11  you've got the closing, and you've got a cutoff, and then you

12  get a computer to print out what there is as of that moment.

13          MR. HERRING:  Sure.  And these forward flow

14  agreements will apply, Your Honor, to multiple sales of

15  accounts.  There might be one a month from now or then one six

16  months from now, and so that's the notification document that

17  shows -- the notification files that show what was actually

18  being sold.

19          THE COURT:  Right, like a floor plan.

20          MR. HERRING:  Yes, Your Honor.

21          THE COURT:  In a car dealership.  Okay.  So your

22  first argument is that the affidavit of sale is missing, and

23  the forward flow receivables purchase agreement is missing, and

24  that you have called into question whether or not adequately,

25  whether or not the term "receivables" as defined by the parties

1   to the forward flow receivable purchase agreement, in fact,

2   included Mr. Lester's credit holder agreement; and, B, if it

3   did, was it limited merely to the right to collect money owed

4   as of the time of each notification.

5        MR. HERRING:  Yes, Your Honor.

6        THE COURT:  And you're saying that the best evidence

7   rule says that the declaration is insufficient and that I need

8   the document that's relied on, and you're also saying -- now,

9   you are talking hearsay, and I told him 806(3) wasn't at issue,

10  and now you're saying it is, but is that because you're saying

11  it's double hearsay?  Why is her declaration not admissible?

12       I kept saying to him -- I'm sorry.  I kept saying to

13  counsel that you're not challenging the admissibility, you're

14  challenging the sufficiency.  Was I wrong?  Are you challenging

15  the admissibility?

16       MR. HERRING:  No, Your Honor.  I'm just challenging

17  the sufficiency.  I think what I'm saying is her statement is a

18  hearsay statement.  There's an exception because of the

19  business records rule, but there are business records that

20  directly conflict, at least one of them that she provided,

21  directly conflict the statement that she made.

22       THE COURT:  So what you're saying is is that your

23  evidence is that I shouldn't ignore what she attached, and that

24  because it conflicts with what she said, I shouldn't give

25  credence to her legal conclusion?

1          MR. HERRING:  Yes, Your Honor.  What she attached, at

2     least the one part of it, directly undercuts her statement that

3     it was an account that was sold and not just a receivable.

4          THE COURT:  I understand your argument.  So it's not

5     really an under 803(6) argument.  It is really a I don't need

6     mean to put on any evidence because what they put on is

7     internally inconsistent to a point where you can't believe that

8     they've carried their burden?

9          MR. HERRING:  Correct, Your Honor.

10          THE COURT:  Now, there is no challenge to the

11     arbitration clause itself; correct?

12          MR. HERRING:  Correct, not as between Mr. Lester and

13     Synchrony.

14          THE COURT:  Right.  And so if Synchrony were the

15     defendant in this case, your client would agree that Synchrony

16     had the right to require arbitration?

17          MR. HERRING:  Yes, Your Honor, because we're both

18     parties to this agreement.

19          THE COURT:  Right.  And if PRA adequately proved that

20     it should in the shoes of Synchrony, you would agree that PRA

21     had the right to compel arbitration?

22          MR. HERRING:  If it proved that, Your Honor.

23          THE COURT:  Right.

24          MR. HERRING:  Yes.

25          THE COURT:  So are you making the argument then -- I

1  think you're also making the argument, moving to a different

2  aspect of this, that the dispute at issue doesn't relate to the

3  credit holder agreement -- the account established under the

4  credit holder agreement?  Are you saying that?

5      MR. HERRING:  Your Honor, I think we're making a much

6  simpler argument before you even get to the dispute itself, and

7  that is that until -- what this is really is just simple

8  contract law.  It's an agreement that was entered into between

9  Mr. Lester and Synchrony.  And so the question is who were the

10  parties to that contract, and the contract itself defines that,

11  Your Honor.

12      THE COURT:  Yeah, but they have a right to assign.

13  So if they have effectively assigned everything --

14      MR. HERRING:  Sure, Your Honor, but they didn't

15  assign everything.

16      THE COURT:  Right.  So now we're back to the first

17  part.  Okay.  Go ahead.  You were going to say something.

18      MR. HERRING:  Well, there's two ways that PRA can try

19  to stand in the shoes of Synchrony.  First is to say that we're

20  one of the parties to the agreement.

21      THE COURT:  Or we stand in the shoes of one of the

22  parties to the agreement.  I think that's what they're saying.

23      MR. HERRING:  And I think that is maybe what they're

24  trying to say, but I think they are also saying we're kind of

25  an unnamed party or beneficiary to the agreement.

1          THE COURT:  Let's find out if they're saying that

2     before we spend a lot of time on it, okay?

3          MR. HERRING:  Yes, Your Honor.

4          THE COURT:  Ms. Ostroff, is your client saying that?

5          MR. OSTROFF:  Are we saying?  I'm sorry.

6          THE COURT:  Are you saying that you're an intended

7     third-party beneficiary to this credit holder agreement and

8     that your client, therefore, is entitled to invoke arbitration?

9          MR. OSTROFF:  We're saying both, that we are an

10    assignee and a third-party beneficiary.

11         THE COURT:  You're saying both.  Okay.  So he's

12    right.  All right.  I'm sorry, that sounded a little surprised,

13    didn't it?  But I didn't know they were saying that.  That's

14    not your fault though.

15         Okay.  So they are asserting alternatively that, even

16    if I find there's not been evidence to establish an assignment,

17    nonetheless they can invoke the arbitration clause as an

18    intended third-party beneficiary of the cardholder agreement.

19    Okay.

20         Mr. Ostroff, I just said a whole bunch of words.  Are

21    those words you're willing to live with?

22         MR. OSTROFF:  Yes, ma'am.

23         THE COURT:  Okay.  Mr. Herring, so I guess I need to

24    hear about that.  Why are they not -- okay.  You're going to

25    tell me why there are no third-party beneficiaries intended or

1  covered by this agreement.  Is that what you're going to tell

2  me?

3          MR. HERRING:  At least not as to the arbitration

4  agreement, Your Honor.

5          THE COURT:  Okay.

6          MR. HERRING:  And I think -- let me back up on that.

7  I think the third-party beneficiaries would be spelled out in

8  any subsequent contract like the forward flow agreement.

9          THE COURT:  Okay.  I think you're first saying that

10  the arbitration clause is blue penciled out or somehow carved

11  out of the agreement and it itself has to be -- somebody has to

12  be an intended third-party beneficiary of that clause in order

13  for them to be a third-party beneficiary, even though they're a

14  third-party beneficiary of whole the agreement?

15          MR. HERRING:  Correct, Your Honor.

16          THE COURT:  Why is that true?  It seems to me if

17  you're entitled to the whole pie, you're entitled to every

18  single slice.

19          MR. HERRING:  Well, Your Honor, we are entitled to

20  the whole pie if the agreement that transfers that whole pie,

21  in fact, transfers the whole pie.

22          THE COURT:  Right.  And so now we're back to the

23  first argument.

24          MR. HERRING:  If it only transfers parts, then that

25  doesn't count.  And, Your Honor, I guess what I would point you

1  to is the language of the arbitration agreement.

2          THE COURT:  You mean the credit holder agreement?

3          MR. HERRING:  Yes, Your Honor, part of the credit

4  holder cardholder agreement.  It talks about –– and I think we

5  have it up on the Elmo –– that says what claims are subject to

6  arbitration.

7          THE COURT:  All right.

8          MR. HERRING:  In this first paragraph number one, it

9  says, "You and we must arbitrate any dispute or claim."  And

10  let me just back this up and be sure we are clear on who you

11  and we are.  So you and we is simply Mr. Lester or anybody else

12  who uses the card and GE Capital Retail Bank.  It's not any

13  other party.

14          THE COURT:  Okay.

15          MR. HERRING:  So then it goes on to say, "We must

16  arbitrate any dispute or claim between you or any user of your

17  account and us."  And it specifically states, "Our affiliates,

18  agents and/or Lowe's Companies, Inc., if it relates to your

19  account" ––

20          THE COURT:  Except.

21          MR. HERRING:  That's right.  I'm sorry, I couldn't

22  read it for a second.  "Except as noted below."  And that goes

23  on to define if they file a collection suit, that kind of

24  thing.  So what it does not say here and what they –– Synchrony

25  is the one that drafted this.  What it could have said is

1    anybody who purchases the account, any debt collectors, anybody

2    who is associated with us.  It doesn't.  They could have

3    drafted a much broader agreement if they wanted to, but they

4    drafted a very narrow agreement, Your Honor.

5           THE COURT:  And, Mr. Herring, you could have attached

6    these unreported Oregon cases as is, I believe, required when

7    you cite unreported cases without a Westlaw or Lexis or any

8    other kind of published citation to your brief, but you didn't.

9           MR. HERRING:  I apologize for that, Your Honor.

10    That's an oversight on my part.

11           THE COURT:  Well, you tell me that they're

12    persuasive, but how can I be persuaded by something I've never

13    seen?

14           MR. HERRING:  Well, I've brought --

15           THE COURT:  It's kind of a rhetorical question.

16           MR. HERRING:  Sure.  And I brought a copy for Your

17    Honor if you would like a copy.

18           THE COURT:  If you want me to rely on an unreported

19    case, I need a copy, and counsel for defendant needs a copy,

20    Mr. Ostroff.

21           But just because they could have said it better, does

22    that mean they had to say it better?  What's your authority

23    that they had to say it better?

24           MR. HERRING:  Your Honor, it's contract law.  When

25    they write a contract, they have the right and the ability to

1  define exactly who the parties are, who the beneficiaries are.

2        THE COURT:  So this circles around to Mr. Ostroff's

3  initial argument that -- so there is a bit of a dispute to the

4  arbitration clause, not that it's valid, but the scope of it.

5  The meaning of it is now in dispute, and Mr. Ostroff stated

6  accurately that the Court should view it in favor of

7  arbitration.

8        I don't know that that reaches so far as to view it

9  in favor of broadening who is entitled to invoke arbitration.

10  To me that's different than there should be arbitration, but

11  the fact that you're entitled to arbitrate I'm not sure --

12  well, I'm pretty sure it's not the same thing.

13        Being entitled to arbitrate is not the same thing

14  as -- being a person entitled to make an arbitration demand is

15  not the same thing as, if you can't tell whether or not this

16  particular type of claim should be subject to arbitration, then

17  send it to arbitration.  And Mr. Ostroff said I'm supposed to,

18  under this agreement, arbitration agreement, I'm supposed to

19  determine the scope of its reach in terms of the types of

20  claims that are encompassed.  And that's not always true.

21        So given that I'm supposed to determine, I being a

22  court, not an arbitrator, is supposed to determine the scope of

23  the types of claims that come within the arbitrator's

24  authority, and given that the dispute is as to whether or not

25  this party even has the right to invoke the arbitration

1    agreement clause, what is your authority that I should say

2    that?

3            And be more specific than general contract law to say

4    that they had –– okay.  What you're saying is at that point I

5    don't look at the broad view of saying be in favor of

6    arbitration, because I'm not being in favor of arbitration.

7    They're asking me to be in favor of people entitled to

8    arbitrate, which is different than what is being arbitrated.

9            MR. HERRING:  Yes, Your Honor.  We're asking you to

10   interpret the terms of the contract.  And you're asking what

11   authority.  On Page, it's numbered at the bottom, Page 10 of

12   the opinion I just handed to you.

13           THE COURT:  Okay.  This opinion is Felicia

14   Sprayberry versus Portfolio Recovery Associates, case number

15   3:17–CV–112–SB in the District Court of Oregon, United States

16   District of Oregon, Beckerman, magistrate judge.  Okay.  And I

17   will file it in so that it's in the record.

18           MR. HERRING:  Yes, Your Honor.  Thank you.

19           THE COURT:  So anyway Page 10.

20           MR. HERRING:  Page 10, Your Honor, the last full

21   paragraph.  The Oregon court, citing to the Northern District

22   of Ohio opinion, notes that GE Bank was free to include debt

23   collector, purchaser of accounts, anyone connected with GE.

24           It then goes on in the –– goes on in the note to

25   describe, "Noting that the arbitration clause and credit card

1    agreement defined us to include," and it goes on to define who

2    it included, and that's not the language you have here.  You

3    have very restrictive language here as opposed to more

4    inclusive language.

5            THE COURT:  Well, they also go on to say, so this is

6    a rejection of the third-party beneficiary argument.  And then,

7    alternatively, in the next paragraph, which is on Page 11, this

8    court rejected that there had been an assignment.  Although

9    they say GE Bank could have taken care to effect an assignment

10   of its receivables or consumer accounts to PRA.  Then they say

11   GE Bank -- the judge says, GE Bank chose not to do so, and then

12   the judge says accordingly pursuant to the express terms of GE

13   bank's agreement, GE Bank never assigned Sprayberry's

14   receivable or her consumer account to PRA.  And, therefore, PRA

15   may not enforce GE bank's arbitration clause as its assignee.

16           The magistrate judge did not say Sprayberry's

17   receivables and her consumer account, and it doesn't say

18   Sprayberry's account.  It says receivable or consumer account.

19   So perhaps this judge would have said, had there been an

20   assignment of the receivable been shown, then that would have

21   been enough without an assignment -- without a showing of an

22   assignment of the consumer account.  I just saw this for the

23   first time so I don't know.

24           MR. HERRING:  Judge, I think -- I'm still trying to

25   find that -- so the bill of sale in this case is almost

1  identical to the bill of sale in our case, if I remember

2  correctly.

3      THE COURT:  I don't see the language to that in this

4  one just glancing through it.  Maybe it's in a footnote.  Here.

5  Okay.  Look at Page 3.  The judge said, "On February 29, 2012,

6  pursuant to a purchase and sale agreement, PRA purchased,

7  quote, a pool of accounts, close quotes, from GE Bank,

8  including Sprayberry's receivable.  The terms of the purchase

9  agreement required GE Bank to sell, quote, all rights, title

10 and interest into the receivables with respect to which PRA has

11 received a notification file, close quotes.  The sale files

12 include information identifying all the purchased accounts

13 including Sprayberry's consumer account ending in 908A."

14      So that isn't the bill of sale.  Is that the language

15 that you were thinking was similar?

16      MR. HERRING:  Yes, Your Honor.  And that's I think --

17 well, so there again, the bill of sale is actually a subpart of

18 the purchase agreement.

19      THE COURT:  Yes.  I see in the reference to, which I

20 didn't state, where there's a reference to the declaration, and

21 the Exhibit 2 -- Exhibit A, a bill of sale; Exhibit 3, forward

22 flow receivables purchase agreement, filed under seal.

23      Then at Page 8 of this document, the magistrate judge

24 finds that there was no assignment.  They says, "PRA does not

25 qualify as an assign of GE Bank pursuant to the terms of the

1  arbitration clause."  Then they say, "PRA cannot identify any

2  agreement whereby GE Bank assigned Sprayberry's consumer

3  account or her receivable to PRA," even though the language

4  says, "But both of sale and the purchase agreement make it

5  clear that, although GE Bank, transferred, sold, conveyed,

6  granted and delivered, Sprayberry's receivable to PRA, it did

7  not assign -- I'm emphasizing the words that are in italics --

8  "the receivable nor the consumer account nor the consumer

9  account."

10          "PRA's counsel acknowledged at oral argument a scale

11  or transfer is not same thing as an assignment.  You can sell

12  something without assigning any rights.  You can transfer

13  something potentially without assigning any rights."

14          "And the purchase agreement," which I don't have in

15  this situation itself, according to the magistrate in that

16  case, the case I'm reading from, "was careful to distinguish

17  between selling or transferring a receivable and assigning a

18  receivable."  And quotes from the sealed filed purchase

19  agreement, "Each of seller and buyer shall maintain a computer

20  file of all receivables sold or reassigned under this

21  agreement.  Buyer may sell or transfer any of the receivables

22  but not assign this agreement to a third party."

23          And then the judge refused to bootstrap, judge's

24  term, PRA into the contractual term "assigned" because there

25  was no assignment clause in the purchase agreement or bill of

1  sale.  And then contrary authority was discussed.

2       MR. HERRING:  Your Honor, if I may, the language in

3  the forward flow agreement the judge cites to, it's the exact

4  same language in the sample that I provided Your Honor.

5       THE COURT:  Has the Eleventh Circuit made any kind of

6  decision on this issue?

7       MR. HERRING:  Not that I've seen, Your Honor.

8       MR. OSTROFF:  Not that I'm aware of, Your Honor.

9       THE COURT:  Okay.  Has any circuit court made a

10 decision on this issue?

11      MR. HERRING:  Not that I'm aware of, Judge.

12      MR. OSTROFF:  Yes, Your Honor.  The decision by the

13 Sixth Circuit in Stratton versus Portfolio Recovery Associates,

14 LLC -- its citation is 706 F.Appx 840, (2017) U.S. App Lexis

15 16308.

16      THE COURT:  I wish it were reported, but anyway at

17 least it's a circuit opinion.  Anything APPX is not reported.

18      MR. OSTROFF:  Understood, Your Honor.

19      THE COURT:  Okay.  Thank you.  I'll look at that to

20 see what that circuit said about it.

21      What other arguments do you have that I've perhaps

22 overlooked or you would like to argue further?

23      MR. HERRING:  Your Honor, if I can confer with

24 co-counsel?

25      THE COURT:  Of course.

1          (Brief pause.)

2          MR. HERRING:  Your Honor, I think the only additional

3   thing I would point out is that the reason in Sprayberry there

4   was such an extensive discussion of assignment is, on Page 5 of

5   the opinion, the Court provided a copy of the arbitration

6   clause, and that arbitration clause talks about -- defines we

7   and us.  And instead of just defining it to GE Money Bank, the

8   retail bank, it goes on to talk about affiliates, predecessors,

9   successors and assigns.  We don't have that situation in our

10  case, and I think that's where that --

11         THE COURT:  Okay.  So you're saying this case helps

12  you on your argument that there was no assignment.  But even if

13  I disagree with you on the assignment, this case wouldn't go

14  the other way, finding an assignment, because before this

15  judge, this magistrate judge, was not the issue of whether or

16  not an assign has to be specifically carved out.

17         MR. HERRING:  I believe so, Your Honor.  I think

18  there was --

19         THE COURT:  It helps you if I agree that there was no

20  assignment, and the case is distinguishable if I think there

21  was an assignment.

22         MR. HERRING:  Correct, Your Honor.  And I think this

23  case also though spells out where there is -- even though the

24  arbitration clause says assignment, the sale documents entered

25  into between PRA and Synchrony have to have an assignment of

1    those rights, and there is no assignment of those rights.

2    There's just the sale of the receivable.

3         THE COURT:  Right.  It's helpful to your argument --

4    you rely on it for your argument that they haven't shown any

5    assignment.

6         MR. HERRING:  Correct, Your Honor.

7         THE COURT:  And that an assignment is necessary in

8    order to be able to invoke an arbitration clause?

9         MR. HERRING:  Yes, but also there has to be an

10   assignment of the specific rights.

11        THE COURT:  Yes.  I was speaking kind of in a

12   building block way, and I didn't get to that finer point.  But

13   I wasn't trying to pretermit it simply by not saying

14   everything.

15        MR. HERRING:  Thank you, Your Honor.

16        THE COURT:  Thank you.  Did you want to argue some

17   more or respond?

18        MR. OSTROFF:  There's a couple of arguments I would

19   like to make, Your Honor.  I appreciate the opportunity to make

20   a couple of additional points.  The first is I want to make

21   sure the Court is aware that the Sprayberry magistrate report

22   or recommendation was objected to.  There's been no decision by

23   the district court judge yet in that case.  So this entire

24   opinion could be thrown out the window any day now.  It could

25   be entirely rejected.

1          And I say that, Your Honor, because I think it's

2   important that this is the only case I'm aware of that has ever

3   interpreted these situations in this way about requiring

4   someone to use the magical word of assign.  I think that's what

5   you said earlier today.

6          THE COURT:  I did use the term magic word.

7          MR. OSTROFF:  All the other cases have not found that

8   to be true, because all those cases, like the Stratton case,

9   have -- and I can pass up a copy of the Stratton case if I may.

10         THE COURT:  Sure.  It's reported.

11         MR. OSTROFF:  This is a Sixth Circuit case.

12         THE COURT:  Right.  Thank you.

13         MR. OSTROFF:  You're welcome.  The Stratton court,

14  from my perspective, Your Honor, and I recognize it's my

15  advocate's perspective, but the Stratton court does a very nice

16  job in our view of saying -- of going through these same exact

17  factual scenarios and saying, look, Portfolio is the assignee

18  of GE.  And it's doing that, not based upon any language that

19  says you're an assign, just based upon the actual bill of sale

20  and the forward flow agreement, but the bill of sale itself

21  says the transfers, sells, conveys, grants and delivers to

22  buyer with recourse the receivables.

23         And the court in this case rejected the same argument

24  in front of you have today that there's distinction between

25  account and receivable, and you've got to have some sort of

1  magic language showing it was assigned as opposed to just being

2  purchased, and that's what the other cases that are typically

3  cited in this context -- there's the Cronin versus Portfolio

4  Recovery Associates case, 2016 --

5           THE COURT:  Are these in your brief?

6           MR. OSTROFF:  I believe they are, Your Honor.  2016

7  U.S. District Lexis 57541.  That's in the Middle District of

8  Florida.  April 20th --

9           THE COURT:  Did you get all that because I sure

10 didn't?

11          MR. OSTROFF:  April 29th, 2016, and then the Mark

12 versus Portfolio Recovery Associates case, 2015 U.S. District

13 Lexis 54498.  That's from the Northern District of Illinois

14 April 27.

15          THE COURT:  Mark is not in your table of contents,

16 table of authorities.  I'm just telling you.

17          MR. OSTROFF:  Yes, Your Honor.  Our opening brief may

18 not have gotten into the weeds on this particular issue because

19 we were unaware it was going to be such an issue.  But

20 nonetheless, I think from our perspective what is particularly

21 important there is that all these other courts, Sprayberry

22 being the lone exception, have determined that in this

23 situation where PRA or other debt buyers, the Stratton case

24 cites a decision called Martin versus Cavalry SPI, LLC, 2014

25 U.S. District Lexis 43293, and it's Eastern District of

1  Kentucky, March 31st, 2014.

2          In saying that it's clear that in this situation

3  where you're doing this type of purchase, even if the document

4  says you're purchasing a receivable, you're an assignee.  The

5  rights of the assignees are generally subject to all the terms

6  of an agreement between the debtor and the assignor unless

7  explicitly limited in the agreement, and that's in the UCC.

8          You know, generally, it's the UCC 9-404, but this

9  agreement is governed by Utah law, and Utah has incorporated

10 that same UCC provision.  It's Utah code 70A-9a-404.

11         THE COURT:  Are you saying that this agreement that's

12 in front of me is governed by Utah law, or are you saying that

13 the one that was in front of the Stratton court or both?

14         MR. OSTROFF:  I'm not sure about the Stratton court,

15 but I can you this one is.

16         THE COURT:  Okay.  Utah law controls.

17         MR. OSTROFF:  Federal law and Utah law.

18         THE COURT:  All right.  And what was that Utah law

19 cite?

20         MR. OSTROFF:  It's Utah Code 70A-9a-404.  It's their

21 incorporation of the general UCC provision of 9-404 about the

22 rights of an assignee are subject to all the terms in the

23 agreement between an account debtor and the assignor.

24         And what that means is that they actually have to do

25 something to express the limited -- in other words, you get the

1    whole account including every provision, including the

2    arbitration provision, unless you say something to take it out.

3            THE COURT:  I understand.

4            MR. OSTROFF:  Which is sort of opposite of what the

5    plaintiff's counsel is saying is you should do more to

6    expressly say it's in there.  And the question would be why

7    aren't you doing that, and the answer is because the UCC

8    doesn't require it.

9            And what's interesting about Sprayberry is Sprayberry

10   doesn't actually cite anywhere to the UCC.  It's as if the

11   court did not consider the applicability of the UCC in Article

12   IX to these types of sales of credit card paper, which are

13   clearly covered by UCC.  So I wanted to point that out.

14           And then one of the things that I think is important

15   about the Stratton decision, Your Honor, is that it goes on to

16   say, "We, therefore, conclude that Portfolio now stands in GE's

17   shoes as an assignee of the right to collect Stratton's debt."

18   And it cites Paragraph 325, comment A.

19           And what that says is "The creditor typically

20   delivers to the assignee a written instrument addressed to the

21   debtor, directing the debtor to pay all or part of the debt to

22   the assignee.  The writing is an assignment."

23           We don't think we need something to magically say

24   this has been assigned.  But, Your Honor, this is what I handed

25   up to your clerk before the hearing today.  If the Court really

1    lie believes that that is necessary, here it is.  This

2    letter --

3                THE COURT:  Did you give a copy of this to --

4                MR. OSTROFF:  Yes, before the hearing, Your Honor.

5                THE COURT:  Thank you.

6                MR. OSTROFF:  This letter itself, we don't believe

7    you have to the magic word of assign, and I want to make that

8    point very clear.

9                THE COURT:  I heard you.

10               MR. OSTROFF:  But even if the Court were to find that

11   you did and find that, no, you've got to actually prove

12   assignment, under the restatement of contracts, this proves

13   that.

14               THE COURT:  Okay.  I mean, okay I hear you.

15               MR. OSTROFF:  And I appreciate that, Your Honor.

16   Just a couple of other points, and I appreciate your patience.

17   I think one of the things that's important to talk about when

18   the plaintiff's counsel was referring to the language in the

19   agreement is that the language in the credit card agreement is

20   very specific as to who the us, we and I are, and that is

21   defined as GE Money Bank.

22               They have admitted in their brief and here today,

23   they don't contest that Synchrony, not defined in the original

24   agreement, could enforce this arbitration clause.  They

25   specifically admitted that on the record; right?  No challenge,

1  they said there's no challenge to the arbitration clause itself

2  as between Lester and Synchrony.

3          If that's true, then that helps us establish why

4  their argument fails as to whether or not we are entitled to

5  enforce this, because they can't have it both ways.  They can't

6  point to the language of we, our, us in the original agreement

7  and say that doesn't include PRA, but still say, well, it

8  includes GE Capital Retail Bank and includes Synchrony, too,

9  which is what they've said.

10          And so if they admit on the record that it would be

11  applicable to apply to Synchrony, the same is true with respect

12  to us.  That's all I have.

13          THE COURT:  All right.  Thank you.  All right.  I

14  will take this under advisement.  I will read the cases, and I

15  will get a written opinion out.  Thank you.

16          (Court adjourned.)

17

18

19

20

21

22

23

24

25

• `          58

# C E R T I F I C A T E

I hereby certify that the foregoing transcript in the
above-styled cause is true and correct.


Date:  8/6/2018



Julie A. Martin, RMR, CRR

Federal Official Court Reporter